```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK:  CRIMINAL TERM:  PART 85
 2    ----------------------------------------------x
      PEOPLE OF THE STATE OF NEW YORK
 3                                     SORA Hearing

 4              -against-              Indictment No.
                                      00745-1990
 5
      SAMUEL SANCHEZ,
 6
                         Defendant.
 7    ----------------------------------------------x

 8                                   New York Supreme Court
                                     111 Centre Street
 9                                   New York, New York  10013

10                                   September 14, 2016

11
      B E F O R E:
12
            HONORABLE ROGER S. HAYES, Justice of the Supreme Court
13

14
      A P P E A R A N C E S:
15

16    FOR THE PEOPLE:

17              CYRUS R. VANCE, JR., ESQ.
                District Attorney of New York County
18              BY:  DAVID FILER, ESQ.

19
      FOR THE DEFENDANT:
20
                CENTER FOR APPELLATE LITIGATION
21              Attorneys for Defendant
                BY:  LAUREN SPRINGER, ESQ.
22                   MOLLY SCHINDLER, ESQ. (via video conference)

23

24
                                             Lisa Mango
25                                     Senior Court Reporter
```

LM

1      that is why I pointed that out so that whatever decision I

2      make will not be dependent on a non-professional medical

3      person's medical prognosis for the future.

4              I said it respectfully, but I do grasp that point.

5              MS. SPRINGER:  Okay.

6              THE COURT:  You know, I take that part of what the

7      assistant intended was that I know every time either myself

8      or anyone else who has been hospitalized gets out, just

9      getting out is kind of a boost in a familiar setting, a

10     comfortable setting.  But your point is well made.

11             MS. SPRINGER:  Thank you.

12             I just wanted to point out one other thing too.

13     With respect to the risk level three, if Mr. Sanchez is

14     adjudicated a risk level three, he will be subject to the

15     SARA as I mentioned.

16             But if housing or appropriate placement cannot be

17     found, even though he was granted medical parole, he will

18     remain in prison until such time that that housing can be

19     found, which is what has happened so far.  That is up until

20     he reaches his maximum expiration date and his maximum

21     expiration date is not until October 20, 2030.

22             THE COURT:  Look, as far as the inability to place

23     Mr. Sanchez if he is a level three, that is a terrible

24     dilemma.  As I said, I have an Article 10 matter that is

25     currently being argued before the Court.

1

1  SUPREME COURT OF THE STATE OF NEW YORK

2  COUNTY OF NEW YORK : CRIMINAL TERM : PART 85

3  --------------------------------------------X

4  THE PEOPLE OF THE STATE OF NEW YORK        :Ind.
                                              No. 745-90
5              - against -                    :
                                              HEARING
6  SAMUEL SANCHEZ,                            :

7              Defendant.                     :

8  --------------------------------------------x

9                    100 Centre Street

10                   New York, New York 10013

11                   October 20, 2016

12

13

14  B E F O R E:

15              HONORABLE ROGER HAYES,
                Justice Supreme Court.
16
    A P P E A R A N C E S:
17
        For the People:
18              CYRUS R. VANCE, JR., ESQ.
                District Attorney - New York County
19              BY: DAVID FILER, ESQ.
                Assistant District Attorney
20
        For the Defendant:
21              CENTER FOR APPELATE LITIGATION
                LAUREN SPRINGER, ESQ.
22              MOLLY SCHINDLER, ESQ.

23
                    MAUREEN POSTEL
24                  SENIOR COURT REPORTER

25

                    Maureen Postel
                 Senior Court Reporter

Proceedings            2

1          THE CLERK:  Continued Sex Offender Risk

2     Assessment, Indictment 745-90, Samuel Sanchez.

3     Mr. Sanchez is not yet before the Court.

4          Appearances please.

5          MS. SPRINGER:  Lauren Springer, Center for

6     Appellate Litigation for Mr. Sanchez.

7          THE COURT:  Good morning.

8          MR. FILER:  For the People, David Filer, good

9     morning.

10          THE COURT:  So far we're waiting to have

11     Mr. Sanchez produced for the -- to be present for the

12     hearing.  I take it when I say produced by video that you

13     want to wait until he's produced?

14          MS. SPRINGER:  Yes, your Honor.

15          THE COURT:  I just didn't want us to be waiting

16     and we're already.

17          A VOICE:  Mr. Sanchez will be here shortly.

18          THE COURT:  Thank you.

19          Counsel, is that Mr. Sanchez?

20          MS. SPRINGER:  Yes.

21          THE DEFENDANT:  Good morning, I'm waiting for my

22     lawyer.

23          MS. SPRINGER:  My colleague, Molly Schindler,

24     S-C-H-I-N-D-L-E-R, is also going up this morning to sit

25     with him as part of the hearing.

                    Maureen Postel
                 Senior Court Reporter

Proceedings          3

1          THE COURT:  Ms. Springer, do you know where your

2     colleague is?

3          THE DEFENDANT:  They went to go get her.

4          MS. SPRINGER:  They went to go get her.  She had

5     an appointment at 9:00 a.m. with someone else at the

6     facility.

7          THE COURT:  Okay, we'll wait.

8          MS. SCHINDLER:  Sorry for the delay.

9          THE COURT:  That's all right.

10          Ms. Springer, you have the witness you wish to

11     call?

12          MS. SPRINGER:  Yes, I do.  I'd like to call

13     Dr. John Hammer to the stand.

14          THE COURT:  H-A-M-M-E-R?

15          MS. SPRINGER:  Yes.

16          THE OFFICER:  Raise your right hand.

17          THE CLERK:  Do you solemnly swear the testimony

18     that you give now will be the truth, the whole truth, and

19     nothing but the truth so help you God?

20          THE WITNESS:  I do.

21          THE OFFICER:  State your first name and last

22     name and spell your last name for the Reporter.

23          THE WITNESS:  John Hammer, H-A-M-M-E-R.

24          THE COURT:  Okay.

25

Proceedings           4

1   DIRECT EXAMINATION

2   BY MS. SPRINGER:

3       Q    I'm going to ask that when you speak you use the

4   microphone so that Mr. Sanchez can hear you, which is one of

5   the things that we were cognizant.  So we're trying to make

6   sure that he can hear us.

7       What do you do for a living, Dr. Hammer?

8       A    I'm a physician in internal medicine.

9       Q    Internal medicine.

10      What kind of training have you had?

11      A    I attended medical school in 1980, graduated 1980,

12  that was followed by Fifth Pathways, which is the program

13  which proceeds residency for foreign medical graduates.  I did

14  a residency in internal medicine in Booth Memorial Hospital.

15      Q    What school did you graduate from?

16      A    Far Eastern University.

17      Q    Where is that?

18      A    The Philippines.

19      Q    So you said you graduated in 1980?

20      A    Right.

21      Q    And are you licensed in New York state?

22      A    Yes, I am.

23      Q    And when did you get your license?

24      A    I believe it was 1982.

25      Q    Where are you currently employed?

Maureen Postel
Senior Court Reporter

Proceedings          5

1       A    New York State Department of Corrections, Fishkill

2   Correctional facility in Beacon, New York.

3       Q    How long have you been employed there?

4       A    I've been there since 2004.

5       Q    And where else have you worked?

6       A    I've been in private practice since 1991.  In 2004

7   when I began working part-time at the prison I gradually

8   phased out the internal medicine practice and I think totally

9   finished that in 2010.

10      Q    And what are your duties and responsibilities in your

11  current position?

12      A    At Fishkill Corrections Facility I've been in charge

13  of the Long Term Care Unit since 2004 for the past year or so.

14  I've also been responsible for the Unit for the Cognitively

15  Impaired, and more recently I've also had to cover the

16  infirmary.  We have somewhat of a staff shortage for the

17  moment, but for the most part the Long Term Care Unit.

18      Q    And do you know Mr. Samuel Sanchez, which is DIN

19  number 91A5961?

20      Is it difficult to hear me?

21      A    There is, I'm getting it.

22           MS. SPRINGER:  Can you hear me, Mr. Sanchez?

23           THE DEFENDANT:  Yes.

24      Q    So, I'm sorry, so how do you know Mr. Sanchez?

25      A    Mr. Sanchez first came to the Long Term Care Unit in

Maureen Postel
Senior Court Reporter

Proceedings        6

1    late December 2009, shortly after his stroke.  He stayed 'till

2    somewhere in 2011 when he was transferred to the Unit for the

3    Physically Disabled at Greenhaven Correctional Facility.  He

4    returned to us in November 2015.

5        Q     And how are you involved -- how are you involved in

6    Mr. Sanchez' care?

7        A     Well, all the patients under Long Term Care Unit,

8    there are 30 of them, I'm responsible for their care;

9    referrals for specialists if it's so needed, and any medical

10   issues that arise concerning any of the inmates there would be

11   my responsibility to handle.

12       Q     And what can you please tell us about Mr. Sanchez'

13   medical condition?

14       A     Well, Mr. Sanchez has a number of conditions.  If we

15   want to begin chronologically we might say that he has

16   neurogenic bladder.

17       Q     What does that mean?

18       A     It means that he is unable to sense that when he has

19   to urinate.  The nerve supply to the bladder has been damaged.

20   And I believe that was from a gun shot wound in the distant

21   past.  As a consequence he has to self catheterize in order to

22   urinate.  Since he can't feel the urge to urinate he relies on

23   what we call a shake away.  It's a little alarm that vibrates,

24   and he can set it to any interval of hours, and based on that

25   he would catheterize himself.

Proceedings        7

1     He also has the stroke as we mentioned.  That occurred in

2  2009, December.  As a result of that he's paralyzed on the

3  right side.

4     He also has severe degenerative joint disease, especially

5  involving the lumbosacral spine for which he uses a TENS Unit,

6  which is an electronic device that helps to relieve pain.

7     He has hypertension, his cholesterol is a little high.  He

8  has a pace maker for erythema.

9     He has sleep apnea for which he uses his C-PAP machine,

10  which is a continued positive pressure breathing device at

11  night.

12     He has obesity, that's something that comes with the

13  stroke and immobility and sedentary lifestyle.

14          THE COURT:  What was the last issue?

15          THE WITNESS:  Obesity.

16     Q    And you said it comes with the stroke?

17     A    It comes from sedentary lifestyle, which is very easy

18  to happen in prison, especially if you had a stroke and you're

19  mobility is limited.

20     He also has a severe bilateral hearing loss for which he

21  uses special hearing aides that are wireless.  I think I

22  probably covered everything with that.

23     Q    How much of the obesity is connected to his diet?

24     A    Well, in the prison system many diets are available.

25  We have a dietitian who overseas this sort of thing.  But the

Proceedings          8

1   inmates are able to change their diet, and they can choose a

2   diet that may not be appropriate for them in certain cases.

3   It's been my observation that in general the calories that are

4   provided in the regular diet usually far exceed what an

5   individual would need on a daily basis.  So the tendency to

6   gain weight is there.

7        Inmates are also able to purchase what we call commissary.

8   These are items that they can buy on there own.  And they

9   usually come once a week.

10       Mr. Sanchez I believe is on a low fat/low cholesterol

11   diet.  I think he's been compliant with that.  So the weight

12   gain is almost inevitably in the prison setting, especially if

13   you're hindered by lack of mobility from a stroke.

14       Q    Is the paralysis from the stroke, is that reversible?

15       A    No.  Once a stroke has occurred, if you call it a

16   stroke that means after 24 hours the neurological deficits

17   that have occurred are no longer reversible.  If they do

18   reverse themselves within 24 to 48 hours then its called a

19   TIA, transient ischemic attack.

20       Mr. Sanchez' deficits are permanent.

21       Q    What are his physical capabilities or limitations?

22   What can he do, physically or not do?

23       A    Well, he's able to transfer himself from bed to chair

24   with minimal or no assistance.  He's able to shower himself.

25   He can perform most of what we call ADLs.  Activities of daily

Maureen Postel
Senior Court Reporter

Proceedings          9

1   living without assistance.  So he's fairly independent in that

2   sense.

3       But once in the wheelchair he has difficulty immobilizing

4   himself.  He has the use of only the left arm, and some people

5   in wheelchairs can propel themselves to some degree using

6   their good leg.  But he's very limited in that capacity.  So

7   he usually needs help in pushing the wheelchair.

8       Q    Can you describe a typical day for Mr. Sanchez?  I

9   don't know if you see him on a daily basis.  I guess what I'm

10  asking do you know how he spends his days?  Is he usually in

11  wheelchair, in bed?  Do you have any idea?

12      A    Fair idea, I see him almost everyday.  I pass the

13  room a dozen, at least, everyday.  He spends a lot of his time

14  in the room.

15      We do encourage inmates to get out of the bed.  And even

16  if they're not limited by a stroke a tendency is to spend more

17  hours in the bed than you normally would.

18      But Mr. Sanchez gets up when he can.  When he's in the

19  wheelchair he gets assistance to the day room.  And, again, he

20  can transfer himself, so I think he's limited in the number of

21  hours he can stay in the chair due to his back pain.  That

22  comes from the degenerative disc disease.

23      Q    Is that arthritis?  Is that something like arthritis?

24      A    It's arthritis, it's some misalignment of the spine

25  you might say, things that occur with age, mostly arthritic

Maureen Postel
Senior Court Reporter

Proceedings          10

1   type of issues.

2        Q    And what medications does Mr. Sanchez take?

3        A    Well, it's hard for me to recall everything off the

4   top of my head.  He's on antihypertensive medication.

5        Q    I'm sorry?

6        A    Blood pressure, antihypertensive, he's on pain

7   medication.  He's on medicine to lower his cholesterol,

8   something to help with urination I believe.

9              THE COURT:  How old is Mr. Sanchez?

10             MS. SPRINGER:  You're still 54, Mr. Sanchez?

11        You haven't had a birthday since the last hearing, right,

12        54?

13             THE DEFENDANT:  Yes.

14             MS. SPRINGER:  Yes, 54 years old.

15             THE COURT:  Thank you.

16        Q    What would happen -- he takes these medications on a

17   daily basis?

18        A    Yes, he does.

19        Q    What would happen if he stopped taking these

20   medications?

21        A    Well, all the risk factors that produced a stroke

22   would reassert themselves and he might have another stroke or

23   heart attack.

24        Q    And Mr. Sanchez has been in a wheelchair since having

25   the stroke, so that goes back to 2009 or he's always been in a

Proceedings          11

1    wheelchair since --

2        A    Yes.

3        Q    And what are your expectations for Mr. Sanchez'

4    physical progress?  What do you expect to happen in the future

5    with him physically?

6            MR. FILER:  Objection, I'm not -- I'm unclear.

7        Does she mean within the prison system, once he gets out?

8        I'm not sure what we're getting at here.

9            MS. SPRINGER:  Oh, we'll break it; up in the

10        prison system.

11       A    What are my expectations?

12       Q    Yeah, if he stays in the prison system?

13       A    In terms of changes?

14       Q    Yeah, what kind of changes would you expect in the

15   prison system if he just stays in prison?  Do you expect his

16   condition to get better?

17           THE COURT:  I know it's hard for the witness is

18        over here.

19       A    In terms of his physical conditions, none of the

20   things we mentioned will show improvement.  He could lose

21   weight with proper dietary guidance and caloric restriction.

22   But the stroke can't been reversed.  The hearing can't be

23   corrected.  But the hearing aides will probably help with

24   that.  In other words, I don't expect him to gain anymore

25   mobility than he already has.

Proceedings          12

1    Q    What would surgery -- and you said that the paralysis

2    was permanent, so surgery would not improve -- he wouldn't be

3    able to regain his ability to move with surgery?

4                MR. FILER:  Objection, again, I'm not sure if

5        we're talking about current environment or upon his

6        release?

7                MS. SPRINGER:  We can break it up.

8                MR. FILER:  Okay.  So let's break it up.

9                THE COURT:  I appreciate that parties don't seem

10       to feed on each other, they resolve things by themselves

11       when there's an objection.  But the objection is

12       sustained.  You can rephrase it.

13                I think it's clear that, at least, initially

14       Counsel is asking a series of questions, assuming that

15       the defendant remains in prison.  And then if she wishes

16       she can ask a second series of questions if the defendant

17       is released.  So the objection is sustained.

18   Q    Assuming Mr. Sanchez remains in prison, is there any

19   possibility of his physical condition improving?

20   A    I think not.

21                MR. FILER:  Objection, because I'm not sure what

22       "physical condition" means.  Are we talking about the

23       stroke?  Are we talking about the sleep apnea?  Are we

24       talking about back pain, weight loss, his general

25       physical condition?  Again, I don't believe --

Maureen Postel
Senior Court Reporter

Proceedings        13

1              THE COURT:  The objection is sustained.  If you

2       could break it down?

3       Q    I'm going to go through the list of medical

4    conditions that you said that Mr. Sanchez is suffering from.

5    The question is this, assuming that he remains in prison, is

6    there any possibility of his neurogenic bladder improvement?

7       A    None.

8       Q    Any possibility, assuming he remains in prison, any

9    possibility of the paralysis that he has, if he remains in

10   prison improving?

11      A    None.

12      Q    Any possibility of the degenerative joint disease

13   improving, assuming he remains in prison?

14      A    None.

15      Q    Assuming he remains in prison, is there any

16   possibility of his hypertension improving?

17      A    Well, with medication it's controlled.

18      Q    Assuming that he remains in prison, is there any

19   possibility of his high cholesterol condition improving?

20              THE COURT:  You said assuming he remains in

21       prison?

22      Q    Assuming he remains in prison?

23      A    As long as he remains compliant with his medication

24   it shouldn't worsen, that's also controlled.

25      Q    Assuming he remains in prison, is there any

Maureen Postel
Senior Court Reporter

Proceedings        14

1    possibility of his erythema improving?

2        A    Again, that's difficult to say.  With time things can

3    happen, but he has the pace maker.

4        Q    Assuming he remains in prison, any possibility of his

5    sleep apnea improving?

6        A    I wouldn't expect that to improve, but, again, he

7    uses the C-PAP machine, that also is stable.

8        Q    Assuming he remains in prison, is there any

9    possibility of him dealing with his obesity issues of him

10   losing wait?

11       A    That's a possibility.

12       Q    Assuming he remains in prison, is there any

13   possibility of his severe bilateral hearing loss improving?

14       A    None.

15       Q    Now, I am going to switch to when should he be

16   released.  When he's released I'm going to go through --

17           THE COURT:  There might be an easier way.

18       Assuming the defendant is out of prison would your

19       answers to any of those questions just asked of you be

20       different?

21           THE WITNESS:  I think not, no.

22       Q    Now, I understand Mr. Sanchez was granted medical

23   parole?

24       A    That is correct.

25       Q    What was your involvement in that process?

Maureen Postel
Senior Court Reporter

1      A    I submitted the certification, its called.  And this

2   is addressed to the chief medical officer, Dr. Coningsman.

3   And on that form it illustrates the diagnosis, and if the

4   conditions are expected to remain stable, deteriorate or

5   improve, and any change in his condition which may have

6   occurred since the last application.  This is submitted then

7   to the chief medical officer who either approves or

8   disapproves.  If he disapproves then it stops there.  If he

9   approves then it goes on to the parole board for that

10   approvement.

11          MS. SPRINGER:  Sorry, I was just looking for the

12      medical parole, application report that you had produced.

13          THE COURT:  You want the minutes before --

14          MS. SPRINGER:  I have the --

15          THE COURT:  You want the minutes?

16          MS. SPRINGER:  No, there was actual --

17      Dr. Hammer's parole report, I mean medical parole

18      evaluation.  So it was separate from the minutes.  But I

19      had submitted it to the Court and given a copy to the ADA

20      for the last appearance.

21          THE COURT:  I have a New York State Department

22      Correctional Services Health Service System medical

23      problem history, is that what you were referring to or

24      something else?

25          MS. SPRINGER:  Yeah, it's connected to that,

Maureen Postel
Senior Court Reporter

Proceedings        16

1          yes.  Medical problems and listed in the back of that I

2          believe, yeah.

3                    THE COURT:  You want my copy or you have your

4          copy?

5                    MS. SPRINGER:  Yes, can I borrow your copy

6          actually?  Because I would like Dr. Hammer to read it

7          while we're --

8     Q    This is a copy of the document, the comprehensive

9     medical summary.  Is this something that you prepared?  It's

10    at the back.

11                   THE COURT:  Counsel, you got to speak in the

12         microphone.  You can move the microphone.

13    A    I don't see the medical parole application.

14    Q    No, not the Medical Parole Application.  Did you

15    prepare the Comprehensive Medical Summary?

16    A    No, I signed it at the end, but that's usually done

17    by the nurse whose name is above mine.

18    Q    Okay, so the nurse prepared it.

19    Okay, so did you review what the nurse did?

20    A    Oh, yeah, absolutely, I assisted in filling this form

21    out.

22    Q    Okay.

23    A    This is what's called a -- we call a CMS.  Any time a

24    patient is transferred to or from a Correctional Facility to

25    our unit he comes with a CMS.  And when you apply for medical

                       Maureen Postel
                    Senior Court Reporter

Proceedings        17

1    parole you have to include one of these.

2        Q    This is what was included in the medical parole?

3        A    Well, I signed it March 2nd.  It could be I'd have to

4    see the medical parole application to see the date on that.

5    It could very well be the one.

6        Q    Okay.

7        So in terms of reviewing the Comprehensive Medical

8    Summary --

9        A    I believe a lot of it we had gone over today in

10   court.

11       Q    Can we do the diagnosis?  You said you listed what

12   was chronic conditions, what had shown continued

13   deterioration, right?  Is that information still accurate as

14   far as his present condition?

15       A    Yes.

16       Q    On page three was noted about the kind of care that

17   Mr. Sanchez would need on the level of care application.  It's

18   noted that he's been assessed for residential health care

19   placement.  Could you explain that a little bit?

20       A    Well, again, these CMS forms that we're scrutinizing

21   now could be improved quite a bit.  This particular section,

22   part two, Residential Health Care Placement would imply either

23   a nursing home, skilled nursing facility or assisted living.

24   So this is broader than it would necessarily be.  In other

25   words, there's more specific categories under that.

Maureen Postel
Senior Court Reporter

Proceedings          18

1        Q      What's your understanding of what Mr. Sanchez

2    actually needs?

3        A      Well --

4        Q      What kind of care does he need?

5        A      I would think that he would do well in a nursing home

6    setting given all the conditions we spoke about, the

7    limitations of the stroke.  He is relatively young you might

8    say for that sort of environment.  But he possibly could meet

9    these needs in a family situation, depending if there was

10    wheelchair accessibility and, you know, people to attend to

11    needs as they might arise.

12        Q      So it's possible he could live in a residential with

13    family then, it's possible?

14        A      It's possible.

15        Q      What kind of care would he need if he resided with

16    family?

17        A      Well, he'd need someone to be there observing him a

18    good portion of the day, if not the entire day.  He does need

19    to have access to the urinary catheters.  He occasionally

20    needs batteries for his hearing aides or TENS Unit.  The TENS

21    Unit has special adhesive attachments, you might call it, that

22    need to be changed each day.  As I said, he's independent in

23    his ADLs, but we need someone to do the cooking and the

24    cleaning and the laundry and that sort of thing.

25        Q      Does he need help with showering?

Maureen Postel
Senior Court Reporter

Proceedings          19

1      A    He showers pretty much independently.

2      Q    Does he need help with grooming?

3      A    Grooming, no.

4      Q    And when you say "someone would need to observe him a

5  good portion of the day", how long would -- how long can he be

6  left on his own, or would it be wise to leave him on his own?

7      A    It's a hard thing to say.  You're looking at someone

8  who has had a stroke.  If some mishap occurred, anything

9  occurring in the house, a fire, a need to leave the house for

10  other reasons, someone would need to be there most likely to

11  assist him with that.

12     Q    But in your assessment what would be the ideal

13  setting for him.

14     A    I would have to say, ideally, some sort of assisted

15  living, even a step down from a skilled nursing home.

16     Q    What would be the difference between assisted living

17  and a skilled nursing home?

18     A    Well, the level of care mainly.  Someone in the

19  assisted living is fairly independent.  They usually go

20  shopping on their own.  Sometimes they have their own

21  transportation.  This wouldn't be the case here.  But it's

22  assisted living for people who are more or less independent.

23     Q    You've had an opportunity -- you mentioned that you

24  see Mr. Sanchez daily in the prison.  You had an opportunity

25  to basically observe how he interacts with the staff, how he

Maureen Postel
Senior Court Reporter

Proceedings          20

1    interacts with you; has he ever been sexually inappropriate

2    with the staff as far as you've known him or since he's been

3    under your care?

4        A    I didn't catch -- has he been --

5        Q    What are his interactions with his staff like?

6             MR. FILER:  Objection, objection.

7        Q    You know the answer to the question is this, is he

8    sexually inappropriate with the staff?

9             MR. FILER:  Objection.

10       A    No, I never witnessed anything of that nature, no.

11       Q    On the same Comprehensive Medical Summary there's a

12   section that says behavioral status, it's checked appropriate.

13   This is page two.  Do you have any idea what that would be

14   referring to?

15       A    I'm sorry, what are we looking --

16       Q    Page two, Comprehensive Medical Summary, CMS, item

17   number seven.

18       A    Behavioral status?

19       Q    Yes.

20       A    Appropriate is checked.

21       Q    What does that mean?

22            MR. FILER:  Objection, again, I'm not sure if

23        the Doctor filled out this form or how he can comment on

24        what somebody else checked on the form.

25       A    Well --

                    Maureen Postel
                Senior Court Reporter

Proceedings          21

1          THE COURT:  Objection is overruled.

2     A     I recognize the check.  It was myself who checked

3     that particular box.

4          What does that mean?

5     Q     Yes.

6     A     Well, again, the words sort of speak for themselves.

7     He has not been inappropriate in any way in terms of using

8     profanity or -- well, disruptive behavior of any sort.

9     Q     Are you aware of any incidents where he's been

10    aggressive with the staff?

11    A     I'm not aware of any such incident, no.

12    Q     Now, you've mentioned before, okay, in a conversation

13    with me, but also in court you mentioned, okay, you knew

14    Mr. Sanchez in 2009 when he first had his stroke.  And then

15    you've -- he's come back to your facility in 2015 and

16    everything.  You mentioned to me that he's not the same

17    person, that he's changed.  So can you explain -- can you just

18    give clarification on that?

19               MR. FILER:  Objection.

20               THE COURT:  Overruled.

21               MR. FILER:  Judge, what "is not the same person"

22         mean?  It's so vague.

23               MS. SPRINGER:  What do you --

24               THE COURT:  No, no, one just --

25               MR. FILER:  The question seems profound.

                    Maureen Postel
                 Senior Court Reporter

Proceedings          22

1           THE COURT:  You did hear my ruling.

2           MR. FILER:  Objection, of course.

3           THE COURT:  Good, the witness can answer the

4      question.  Go right ahead.

5           THE WITNESS:  Thank you.

6      A     In 2009, as I recall, when Mr. Sanchez first came to

7      the Long Term Care Unit it was immediately after the stroke.

8           When a man in his early 50s has a stroke this is a little

9      bit difficult to come to grips with, you might say.  So there

10     may have been some latent anger and that sort of thing.

11          In those days he was -- you might use the term somewhat

12     demanding in terms of he needed a lot of reasonable

13     accommodations, what they're called in the prison system.

14     This refers to the hearing aides, amplifier for the telephone,

15     reach extender, which is a little grip device, which extends

16     to reach about a foot and a half and has a pincer at the end,

17     the TENS Unit, as I mentioned, for the back pain.  So we went

18     through that sort of thing, but, again, it was for the most

19     part -- it wasn't disrespectful or disruptive to the ward in

20     general.

21     Q     And how much since --

22     A     Well, he grew a beard, he gained weight, he's a lot

23     more polite and respectful at this point, he's compliant with

24     medication, he doesn't antagonize the staff or get himself

25     involved in verbal disputes, that sort of thing.

1

```
 1   SUPREME COURT OF THE CITY OF NEW YORK
     COUNTY OF NEW YORK:     PART 85
 2   ----------------------------------------X

 3   THE PEOPLE OF THE STATE OF NEW YORK      :   SCI NO.

 4                                            :

 5                -against-                    :  0079/1990

 6   SAMUEL SANCHEZ,                           :
                            Defendant.
 7   ----------------------------------------X
                            100 Centre Street
 8                          New York, N.Y. 10013
                            December 1, 2016
 9

10   B E F O R E:

11       HONORABLE ROGER HAYES, Judge.

12

13   A P P E A R A N C E S:

14   FOR THE PEOPLE:
         CYRUS R. VANCE JR., ESQ.
15       DISTRICT ATTORNEY
         NEW YORK COUNTY
16
     BY: DAVID FILER, ESQ.
17

18   FOR THE DEFENDANT:
         CENTER FOR APPELLATE LITIGATION
19       120 WALL STREET
         NEW YORK, NEW YORK
20
     BY: LAUREN SPRINGER, ESQ.
21

22

23

24
                        ALEXANDER BENT
25                   SENIOR COURT REPORTER
```

P R O C E E D I N G S

1    guidelines.

2        And the second factor, establishing the facts in

3    support of it's existence by a preponderance of the

4    evidence, People versus Watson, 95 AD3d 979.

5        In the Court's opinion, the defense has met it's

6    initial burden of identifying, as a matter of law, an

7    appropriate mitigating factor, and that is the defendant's

8    serious and limiting medical issues.

9        See People versus Hosear, H-O-S-E-A-R, 134 Appellate

10   Division 3d 633.  That's a First Department decision,

11   December 29th of 2015.

12       The issue now becomes whether or not defense has

13   established the facts in support of it's request by a

14   preponderance of the evidence.

15       Let's talk about the defendant's medical conditions:

16       In April of 2016, the defendant appeared before the

17   New York State Department of Corrections and Community

18   Supervision Board of Parole for a hearing pursuant to New

19   York State Executive Law 259s, release on medical parole,

20   or inmate suffering significant debilitating illness.  In

21   today's argument, defense counsel said he also appeared on

22   October of 2016, with the same result.

23       At the hearing, the board members reported that the

24   COMPAS risk assessment for the defendant put him at a low

25   risk across the board for felony violence, arrest, or

P R O C E E D I N G S

1    absconding if the Board took him off parole.

2         At the parole hearing, the defendant said that in 2009

3    he had two strokes.  He appeared at the hearing in a

4    wheelchair, and using oxygen.  The Board noted that he had

5    completed sex offender treatment.

6         And they also noted from his medical history, and I

7    now quote from page 9 of that hearing, where the Board said

8    they had a medical report on file from the chief medical

9    officer of the department, Dr. Koenigsman,

10   K-O-E-N-I-G-S-M-A-N, dated March 9, 2016; I am now quoting

11   from the minutes of the parole hearing, which were quoting

12   a report by that doctor:

13        Fifty-three-year-old male housed at Fishkill RMU,

14   diagnosis of cerebral vascular accident with right

15   hemiplegia, H-E-M-I-P-L-E-G-I-A, and history of atrial

16   fibrillation, PPM, hypertension, neurogenic bladder,

17   hearing impaired, obesity, sleep apnea, and asthma.  He

18   uses a wheelchair to ambulate, requires assistance with his

19   assisted daily living needs, he is not terminal, he is

20   oxygen dependent.  If medical parole is granted, he will

21   need residential placement.  Recommended for parole?  And

22   the doctor checked yes.  The doctor recommends medical

23   parole.

24        Now, during the interview with the Parole Board, the

25   defendant expressed great remorse for his prior actions and

PROCEEDINGS

1   crimes.   Shortly after the hearing, the Board granted the

2   defendant medical parole; what is maybe prior terminology,

3   medical parole, compassionate release.

4       Of course this Court is not bound by the Parole

5   Board's conclusions, but is aware that, by statute, the

6   Board must consider the impact of defendant's release on

7   public safety, as does the Court in this instance.

8       I credit the testimony of Dr. Hammer.  He

9   substantiates the multiple serious health and physical

10  mobility issues the defendant suffers from; and they

11  include stroke, paralyzed on his right side, neurogenic

12  bladder, severe degenerative joint disease, especially the

13  lumbosacral spines, he has a TENS unit to relieve pain,

14  he's got sleep apnea, he has a pacemaker for erythema,

15  E-R-Y-T-H-E-M-A, obesity, and bilateral hearing loss.

16      Dr. Hammer testified credibly and strongly that the

17  paralysis is not reversible, that his deficits are

18  permanent.

19      He added that the defendant is able to transfer

20  himself from bed to chair with minimal or no assistance, he

21  can shower and can do most of the ADL, activities of daily

22  living, without assistance; however, he only has use of his

23  left arm, and needs help in pushing the wheelchair.

24      Dr. Hammer testified that the major physical

25  conditions or limitations will not improve, that the

P R O C E E D I N G S

1    stroke, by this time, from the date of the stroke or

2    strokes is irreversible.  And the hearing, it can't be

3    corrected; hearing aids will probably help.

4         And he certainly said that weight loss is possible,

5    but Dr. Hammer said I don't expect him to gain any more

6    mobility than he already has, that the joint disease isn't

7    going away, and the bladder conditions aren't going away.

8         And the assistant district attorney is properly

9    concerned about, among other things, the risk the defendant

10   would present in an assisted living or nursing home to a

11   vulnerable population.

12        The Court inquired of Dr. Hammer if the defendant is

13   outside the prison system, if he gets great care, is

14   defendant likely to retain use of the paralyzed portion of

15   his body, paralyzed side of his body, and Dr. Hammer said

16   no possibility, whatsoever, and no possibility that he

17   wouldn't need a wheelchair to get around.  And when he is

18   out of the wheelchair, the defendant does not have the

19   ability to move quickly, and he cannot remain standing for

20   any prolonged period of time.

21        So, in conclusion, the Court believes the defense has

22   identified, as a matter of law, a mitigating factor of the

23   kind or degree not otherwise adequately taken into account

24   by the SORA guidelines, and that is the defendant's medical

25   conditions and concomitant physical limitations.

P R O C E E D I N G S

1          Further, the Court finds that these are factors which,

2      if established, tend to establish a lower likelihood of

3      reoffense or danger to the community, and are of the kind

4      or degree that is otherwise not adequately taken into

5      account by the guidelines.

6          Secondly, the Court concludes that defense has

7      established the facts in support of these factors by a

8      preponderance of the evidence; accordingly, the Court, in

9      it's discretion, concludes that a downward departure is

10     appropriate, is warranted in this case, and the ruling is

11     that the defendant is a level 2 offender, not a level 3

12     offender.

13         Accordingly, the Court has prepared, pursuant to the

14     SORA law, a copy that will be placed in the file, a copy

15     will be given to each counsel.

16         The Court also finds, as it must, according to

17     Correction Law 168-N1, that the defendant is a sexually

18     violent offender.

19         And I want to make sure that the record reflects that

20     defense counsel, and the defendant here, knows that he has

21     a right to appeal this determination.

22              THE CLERK:  Mr. Sanchez has thirty days in which

23     to appeal the finding.

24         Counsel, we are furnishing you with a copy of the

25     right to appeal.

P R O C E E D I N G S

1          MS. SPRINGER:  Okay.  I acknowledge receipt of

2     that.

3          Do you hear that, Mr. Sanchez, you have a right to

4     appeal?

5          Can they hear us?

6              THE COURT:  Counsel?

7              MS. SPRINGER:  Do you understand?  Okay.

8              THE COURT:  How do you want to handle

9     correcting --

10             MS. SPRINGER:  Can we do it in writing?

11             THE COURT:  Sure.

12             MR. FILER:  Sure.

13             THE COURT:  If you disagree, Mr. Filer, you can

14     file whatever you want.

15             MR. FILER:  Of course.

16             THE COURT:  Okay.  Thank you.

17          This concludes everything.  We are in recess.

18                        *  *  *  *  *

19

20     I, Alexander Bent, hereby certify that the above is a true

21     and accurate copy of my stenographic notes.

22

23     _____

24                    Alexander Bent
                       Senior Court Reporter

25